No. 106,102

STATE OF KANSAS, *Appellee*, v. ANTHONY WALLER, *Appellant*.

(328 P.3d 1111)

Opinion filed June 6, 2014.

*David E. Roberts*, of Hutchinson, argued the cause and was on the brief for appellant.

*Keith E. Schroeder*, district attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury convicted Anthony Waller of felony murder and aggravated kidnapping and found him not guilty of aggravated robbery. The district court sentenced him to a hard 20 life imprisonment for the murder conviction and a consecutive 285-month sentence for the aggravated kidnapping conviction.

On appeal, Waller argues that the trial court erred by not instructing the jury on several lesser included offenses of felony murder, aggravated kidnapping, and aggravated robbery and by failing to give a self-defense instruction. He also argues that the trial court erred in failing to grant his motion for a mistrial and that cumulative trial error denied him a fair trial. Finally, he argues that the trial court erred in using a juvenile adjudication to determine his criminal history for sentencing purposes and that his convictions and sentences for felony murder and aggravated kidnapping violate the constitutional prohibition against double jeopardy. For the reasons stated below, we reject Waller's arguments and affirm his convictions and sentences.

## FACTS

On March 9, 2010, Waller's apartment was burglarized. He contacted the Hutchinson Police Department and reported that a PlayStation 2, numerous video games, a camera, clothing, and two pairs of size 13 Air Jordan shoes—one pair orange and white, the other black with lime green—had been stolen. Waller told the responding police officer that he suspected that his downstairs neighbor, Vasie "Joe" Coons, broke into his apartment. Waller informed the officer that Coons had come to his apartment the previous night to use his phone and that he called the phone number 708-7333. It was later determined that this number belonged to Joshua Haines, the victim in this case. Waller also told the officer that while he was working across the street from the apartment building on March 9, he saw Coons get out of a white Mazda RX-8. The responding officer tried to make contact with Coons that day, but no one was at his apartment.

According to Coons—a self-admitted drug user and paranoid schizophrenic who was off his medication when the events at issue took place—Waller later approached him and threatened to "kick [his] ass" in retaliation for the burglary. Waller also informed Coons that he had reported the burglary to the police and that they were now wanting to speak to Coons about the crime. Coons, who was afraid of Waller, denied being involved in the burglary but implicated Haines—Coons' drug dealer and supposed friend—in the crime. Upon hearing this, Waller became mad and expressed a desire to exact revenge upon Haines, suggesting that he wanted to place Haines in the hospital by giving him a beating and that he wanted to tie Haines up and rob his home.

About a month later, on April 9, 2010, Coons went to Haines' house, where he and Haines consumed methamphetamine between 5 p.m. and 10 p.m. that day. After making a trip with Haines to WalMart and returning to Haines' home, Coons left and returned to the apartment building. Coons then stopped by Waller's apartment; while he was there, Waller asked him to call Haines and set up a drug deal for a gram of methamphetamine and to have Haines bring the methamphetamine to Coons' apartment. Think-

ing he could "score some more" methamphetamine if he was able to set up a drug deal for Haines, Coons agreed to make the call, using Waller's phone to do so. Because Waller did not want Haines knowing his phone number, Coons dialed "*67" before dialing Haines' phone number in order to conceal Waller's phone number on Haines' caller ID. Coons spoke with Haines and set up the deal.

After calling Haines, Coons went downstairs to his apartment. Subsequently, Waller, accompanied by Jose Delacruz and Chauncey Grissom, came to Coons' apartment and asked if Haines was coming over. Because a half hour had passed since Coons had spoken with Haines, Coons called Haines, again using Waller's cell phone and dialing "*67" before dialing Haines' number. Coons spoke with Haines, who told Coons he would be at his apartment within a few minutes.

Haines eventually arrived at the apartment building and knocked on the outside door leading into the building. As Coons walked out of his apartment to let Haines in, Waller, Delacruz, and Grissom went to the back bedroom of the apartment. When Coons walked out of his apartment, he saw that Haines was already in the building, standing at the top of the stairs leading down to Coons' apartment. Haines proceeded to walk down the stairs and into the apartment. As Haines walked down the hallway leading to the bedroom, he asked out loud whether anybody else was inside the apartment. At this moment, Waller came out of the bedroom and attacked Haines, hitting him and tackling him to the floor. Delacruz then joined Waller, and the two of them began kicking and hitting Haines. Waller eventually hit Haines with a 2 x 4 board that was in the apartment, splitting Haines' ear open. Delacruz grabbed a chair and hit Haines with it.

While Waller and Delacruz were attacking Haines, Coons said that Grissom was pacing back and forth, looking out the windows of the apartment, and eventually participated in the beating by hitting Haines with a mop handle a couple of times. Coons said that he tried to intervene, but Grissom prevented him from doing so. Shortly thereafter, Grissom left the apartment.

During the altercation, Coons saw a baggie of methamphetamine on the floor, which belonged to Haines. Coons picked up the baggie and kept it.

Eventually, Waller and Delacruz dragged Haines into the bedroom, put duct tape over his mouth and arms, and wrapped video game controller cords around him. Waller, Delacruz, and Coons then left the apartment, leaving Haines behind. According to Coons, Haines was still alive at this point. Waller, using Haines' car—a white Mazda RX-8—drove them to Haines' home. On the way there, Waller told Coons that he wanted to burglarize Haines' home.

When the men arrived at the residence, Waller attempted to have Coons assist him with the burglary. Coons refused and ran away from the scene. According to Coons, he proceeded to walk around Hutchinson that night while consuming Haines' methamphetamine.

At around noon on April 10, Coons returned to the apartment building and saw Waller. According to Coons, Waller asked him whether he had been home yet. Coons said no. Waller then told Coons that he had broken into his apartment, removed Haines' body, carried the body to Haines' car, and then drove the car and parked it down on Baker Street.

Coincidentally, after Coons returned to the apartment building, officers from the Hutchinson Police Department arrived at the scene to execute multiple arrest warrants for Coons. After meeting with the landlord, the officers walked towards Coons' apartment. The officers noticed a large amount of blood on the sidewalk outside of Coons' apartment, drops of blood on the stairs leading down to the apartment, swipes of blood on the stairwell walls, and blood on the threshold of the apartment door.

Officers entered the apartment and saw numerous bloodstains inside. The stains were primarily concentrated in the hallway and the bedroom. The officers also noticed a 2 x 4 board with blood on it and a green plastic baggie containing a white crystal substance, which one of the officers suspected was methamphetamine. In the bedroom, trash was scattered on the floor and a mattress was overturned.

After searching and not finding Coons inside his apartment, officers spotted him walking away from the apartment building. The officers eventually located him winding his way down on the 1300

block of Baker Street. When the officers approached him, they noticed that Coons was smoking marijuana and had the handle of a large butcher knife sticking out from his rear waistband. Coons refused the officers' orders to stop, so the officers used tazers to take Coons into custody. While arresting Coons, officers found a small green baggie containing a white crystal substance in Coons' front left pants pocket. This substance was later determined to be methamphetamine. Officers also found a syringe and a glass smoking pipe inside a jacket that Coons was holding. The pipe contained methamphetamine residue inside it. Coons was transported to jail.

As Coons was being arrested, law enforcement received a report that a car parked in the 1500 block of Baker Street had a body inside it. Police officers responded to the scene and found a white Mazda RX-8 registered to Haines. Haines' body was lying on the front seat. He was wearing a black shirt but did not have pants or underwear on. A black KU jacket was covering the lower portion of his body. Investigators at the scene noticed that Haines had a large cut to his elbow, cuts to an ear, scrapes on his back, his eyes were black and blue, and he had injuries to his head, which appeared to be severely swollen. Haines also had a blackish gray mark around his neck, indicating that he was strangled. A small amount of blood was found inside the car, indicating to investigators that Haines was killed somewhere else and then placed inside the car.

At the jail, Coons acted fidgety and his speech was jumbled, leading the officer who arrested him to believe that he was under the influence of drugs. The officer asked Coons about the blood inside his apartment. Coons responded by saying that "people had been creeping in and out of his apartment." When asked to identify these people, Coons said he was not going to rat anybody out. The officer asked Coons to provide him with at least a first name. Coons said that "Josh" was the one "creeping in and out of his apartment." Coons later said that Josh was his friend. By this time, the officer was aware that the body found in the vehicle had been identified as Haines.

After Coons spoke with the officer, a jail deputy patted him down and discovered a small baggie of cocaine located inside his sock. Blood was also discovered on Coons' left shoe and on his

pants. Subsequent testing of this blood found the presence of Haines' DNA. A cut and other bloody marks were observed on Coons' hands. Later that day, another officer tried interviewing Coons but ended his efforts when it became obvious that Coons was under the influence of drugs.

After obtaining a search warrant for Coons' apartment, law enforcement officers from the Hutchinson Police Department and the Kansas Bureau of Investigation conducted an extensive investigation of the area around and inside the apartment. Bloodstains and DNA testing of those stains confirmed that Haines was attacked inside Coons' apartment and then carried to a vehicle in the parking lot.

On the roof of the entryway leading into the apartment building, officers found a pair of pants. Blood, duct tape, and duct tape adhesive were found on the outside of the pants. A cell phone belonging to Haines was found inside one of the pockets. Officers also found a belt hanging from a nearby tree.

Officers found a pair of size 12 black shoes inside a doghouse of a residence immediately to the east of the apartment building. It was later confirmed that blood was present on these shoes. Haines' DNA was found on the outside of the left shoe. Waller's DNA was found on the inside of the shoes.

A beer can was found at the bottom of the stairs leading to the entrance of Coons' apartment. Subsequent testing of this can revealed the presence of Waller's DNA.

Inside the apartment, investigators found (1) a black leather jacket with blood and remnants of duct tape on it (Coons said that Haines was wearing a black leather jacket); (2) a black cable with duct tape on it; (3) a second cell phone which was later determined to also belong to Haines; (4) pieces of latex gloves; (5) a board with bloodstains concentrated at one end; (5) a mop with blood on the handle; and (6) an overturned broken chair with blood on it.

Testing of all the samples taken from inside the apartment could only definitely show the presence of Haines' DNA. Though DNA from other contributors was found on some of the samples, there was an insufficient amount of DNA present to identify the con-

tributors. Furthermore, officers did not collect anything inside Coons' apartment that could be linked to Waller.

Waller voluntarily spoke with detectives on April 11 and consented to a search of his apartment. During this interview, detectives inspected Waller's shoes and did not see anything incriminating. Waller's statements during this interview were never introduced at trial. During the search of Waller's apartment—which was described as being untidy—officers noticed a strong odor of cleaning supplies. Cleaning supplies were found by the inside entryway to Waller's apartment and by the entryway into the living room. The search of Waller's apartment, however, did not reveal any direct evidence linking Waller to Haines' murder.

On that same day, Dr. Bamidele Adeagbo, a medical examiner and deputy coroner at the Sedgwick County Regional Forensic Science Center, performed an autopsy of Haines. The examination revealed that Haines had somewhere between 50 and 70 total impact sites on his body. Adeagbo observed more than 30 impact sites to Haines' head. Adeagbo noted that the left and right frontal bones and the zygomatic bones of Haines' face, as well as his left jaw bone, were fractured. Adeagbo also stated that Haines' neck showed signs of being strangled.

Adeagbo did not see any injuries to Haines that were caused by a knife, nor did he find any evidence to suggest that Haines was sexually assaulted. A test of Haines' blood did reveal that amphetamine and methamphetamine were in his system at the time of his death.

Adeagbo determined that the cause of death was multiple blunt force injuries and strangulation and that either could have caused Haines' death.

On April 12, officers interviewed Coons; it was a new morning and Coons appeared to have sobered up since his arrest. On this same day, police arrested both Waller and Delacruz. While Waller was being booked into jail, an officer noticed a small piece of duct tape attached to Waller's shoe. Waller's shoes and the jeans he was wearing were taken into custody and subsequently tested for DNA. Though blood was found on the shoes, the sample was insufficient

for DNA testing. Testing of the jeans revealed the presence only of Waller's blood.

Police conducted a second search of Waller's apartment on April 12. During the search, police found an empty Nike shoe box for size 12 shoes. Though the shoes found in the neighbor's doghouse were size 12 shoes, it is unclear from the record whether the shoes' brand was Nike. Police also searched Delacruz' apartment, finding pieces of burnt clothing in an alleyway near the patio of Delacruz' apartment.

Grissom was arrested in Wichita on April 14, 2010, and interviewed on April 20. On August 22, 2010, Wichita police discovered a wallet belonging to Haines stuffed behind the backseat cushion of a police cruiser—the same cruiser that Grissom was transported in after being arrested. Grissom later admitted that when he was arrested, he had possession of Haines' wallet and that he had stuffed the wallet behind the seat cushion while sitting in the backseat.

Police obtained Waller's cell phone records, which showed that on April 10, 2010, at 12:13 a.m., someone using Waller's phone dialed "*67" and then the number 708-7337—a number assigned to one of Haines' two cell phones. The records indicated that this call was not completed. A minute later, a second call was made, this time "*67" was dialed, then the number 708-7337. This call lasted 93 seconds. At 12:25 a.m., a third call was placed. Again, "*67" was dialed, then the number 708-7337. This call lasted 110 seconds.

The State charged Waller with felony murder (based on the underlying felonies of either robbery or kidnapping), aggravated kidnapping, and aggravated robbery.

The jury found Waller guilty of murder and aggravated kidnapping but acquitted him of aggravated robbery. The trial court sentenced Waller to a hard 20 life sentence for the felony-murder conviction and imposed a consecutive 285-month prison sentence for the aggravated kidnapping conviction. Waller filed a timely notice of appeal.

More facts will be stated as they become pertinent to the issues discussed below.

## Jury Instructions

Waller first argues on appeal that the trial court erred when it failed to instruct the jury on several lesser included offenses related to the crimes of felony murder, aggravated kidnapping, and aggravated robbery. He also argues that the trial court should have instructed the jury on self-defense. Each of these issues will be addressed in turn.

### A. *Lesser Included Offenses of Felony Murder*

Waller contends that the trial court should have instructed the jury on second-degree intentional and unintentional murder, voluntary manslaughter (based on an intentional killing committed during a sudden quarrel or in the heat of passion), involuntary manslaughter (based on a reckless killing), and battery as lesser included offenses of felony murder. Waller concedes in his brief that he failed to request these instructions. Accordingly, review of this issue is controlled by K.S.A. 22-3414(3) and the stair-step analytical process set out in *State v. Herbel*, 296 Kan. 1101, Syl. ¶¶ 7-8, 299 P.3d 292 (2013), and *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

As *Williams'* articulated, K.S.A. 22-3413(3) creates a procedural hurdle when a party fails to object because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included offense instruction, unless the giving or failure to give the instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. 295 Kan. at 511-12.

To establish whether the giving or failure to give an instruction was clearly erroneous, the reviewing court must first determine if there was any error at all. This requires an evaluation of whether the proposed instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different ver-

dict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516.

### 1. *Legally Appropriate?*

Under K.S.A. 22-3413(3), a trial court must provide lesser included offense instructions "where there is some evidence which would reasonably justify a conviction of some lesser included crime." At the time of Waller's trial, however, felony murder was excepted from the purview of K.S.A. 22-3413(3) under a court-made rule, commonly referred to as the felony-murder instruction rule. See *State v. Becker*, 290 Kan. 842, 856-57, 235 P.3d 424 (2010) (lesser included offense instructions required in felony-murder case only if evidence of underlying felony is weak, inconclusive, or conflicting).

While Waller's appeal was pending, this court decided *State v. Berry*, 292 Kan. 493, Syl. ¶¶ 2-6, 254 P.3d 1276 (2011), in which this court abandoned the felony-murder instruction rule and held that the standard contained in K.S.A. 22-3414(3) for instructing on lesser included offenses applied to felony-murder cases. The *Berry* decision made clear that its holding applied to all pending felony-murder cases such as this one. 292 Kan. at 514. During the 2012 legislative session, however, the legislature amended the statute governing lesser included offenses to state: "[T]here are no lesser degrees of murder in the first degree under subsection (a)(2) of K.S.A. 2013 Supp. 21-5402 [the felony-murder statute], and amendments thereto." K.S.A. 2013 Supp. 21-5109(b)(1); see L. 2012, ch. 157, sec. 2. This amendment did not contain language indicating whether the legislature intended for the amendment to apply retroactively or only prospectively.

In *State v. Wells*, 297 Kan. 741, 305 P.3d 568 (2013), this court had to determine whether the 2012 amendment eliminating all lesser included offenses for felony murder prevented *Berry* from applying to felony-murder cases still pending after the statutory amendment went into effect. The court began its analysis with this observation:

"The general rule is that a statute operates only prospectively unless there is clear language indicating the legislature intended otherwise. *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 (2001); *State v. Sisk*, 266 Kan. 41, 44, 966 P.2d 671 (1998). An exception to this rule has been employed when the statutory change is merely procedural or remedial in nature and does not prejudicially affect the substantive rights of the parties. *Martin*, 270 Kan. at 608-09; *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255 (1997)." *Wells*, 297 Kan. at 761.

Because the 2012 amendment did not expressly indicate whether it was to apply retroactively, *Wells* proceeded to consider the second exception to the general rule of prospective application of statutory amendments. *Wells* concluded that the elimination of lesser included offenses of felony murder constituted a substantive change. Accordingly, *Wells* held that the 2012 amendment could not be applied retroactively to the case currently before it. 297 Kan. at 761.

After *Wells*, the 2013 legislature amended K.S.A. 2012 Supp. 21-5402 (first-degree murder), adding subsections (d) and (e) to the statute. In K.S.A. 2013 Supp. 21-5402(d), the legislature reiterated that there are no lesser included offenses of felony murder. In K.S.A. 2013 Supp. 21-5402(e), the legislature expressly stated that the amendment is a procedural rule to be applied retroactively to any case currently pending. See K.S.A. 2013 Supp. 21-5402; L. 2013, ch. 96, sec. 2.

In contrast to the 2012 amendment at issue in *Wells*, the 2013 amendment in K.S.A. 2013 Supp. 21-5402 expressly stated that the amendment was to apply retroactively, triggering the first exception to the presumption of prospective statutory application. See *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 (2001) ("The general rule is that a statute operates only prospectively *unless there is clear language indicating the legislature intended otherwise*." [Emphasis added.]). Accordingly, discussion of whether the 2013 amendment is procedural or substantive in nature is unnecessary because the legislature clearly expressed its intent within the language of the 2013 amendment—the statutory change applies retroactively.

Though the legislature has the authority to declare whether a statute is to apply retroactively, that authority is limited by the Ex

Post Facto Clause to the United States Constitution. *State v. Barnes*, 278 Kan. 121, 129, 92 P.3d 578 (2004). Accordingly, unless K.S.A. 2013 Supp. 21-5402 violates the Ex Post Facto Clause, the statute applies to this case, rendering as moot Waller's argument for why the trial court should have instructed the jury on lesser included offenses of felony murder.

Recently, in *State v. Todd*, 299 Kan. 263, Syl. ¶ 4, 323 P.3d 829 (2014), we held that the 2013 amendment does not violate the Ex Post Facto Clause and, thus, the amendment could be applied retroactively to all cases not yet final. This holding means that instructions on lesser included offenses of felony murder are legally inappropriate. Accordingly, the trial court's failure to give the instructions now requested on appeal by Waller was not error, much less clear error.

### B. *Lesser Included Offenses of Aggravated Kidnapping*

Waller contends that the trial court should have instructed the jury on kidnapping, as defined in K.S.A. 21-3420(c), and criminal restraint, as defined in K.S.A. 21-3424(a), as lesser included offenses of aggravated kidnapping. In reviewing this claimed instructional error, this court conducts a four-step analysis. Those steps, with accompanying standards of review, are:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [_____ U.S. _____,] 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Waller preserved the issue by requesting instructions on kidnapping and criminal restraint in his proposed jury instructions and raising an objection at the jury instruction conference when the trial court denied his request. But, even if we assume that failing to give the instructions constituted error, we conclude that such error was harmless. The State presented overwhelming evidence

(*e.g.*, the coroner's testimony regarding the injuries to Haines' body and the numerous bloodstains within Coons' apartment) that Haines sustained substantial bodily injury as a result of being confined against his will inside Coons' apartment. Thus, the evidence clearly established that an aggravated kidnapping was committed against Haines. See K.S.A. 21-3420(c) (defining kidnapping in part as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person: . . . (c) to inflict bodily injury or to terrorize the victim or another."); K.S.A. 21-3421 (A kidnapping become an aggravated kidnapping *"when bodily harm is inflicted upon the person kidnapped."* [Emphasis added.]); K.S.A. 21-3424(a) (defining criminal restraint as "knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty"). Accordingly, we conclude there is no reasonable possibility that the error did affect the outcome of the trial in light of the entire record. See *Plummer*, 295 Kan. at 168.

### C. *Lesser Included Offenses of Aggravated Robbery*

Next, Waller argues that the trial court should have instructed the jury on robbery as a lesser included offense of aggravated robbery. Considering that Waller was acquitted of aggravated robbery, this issue is now moot.

### D. *Self-Defense Instruction*

Waller argues that the trial court should have instructed the jury on self-defense pursuant to K.S.A. 21-3211(a). Waller did not request this instruction. Accordingly, review of this issue is controlled by K.S.A. 22-3414(3) and the stair-step analytical process set out in *Williams*.

K.S.A. 21-3211(a) states:

"A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force."

Even if we assume without deciding that giving a self-defense instruction based on K.S.A. 21-3211(a) would have been legally

appropriate, such an instruction would clearly not have been factually appropriate.

Waller testified that he walked out of the bedroom and saw Haines walking down the hallway towards the bedroom. Waller asked Haines, in a nonthreatening manner, "[W]hat's up man; you got my stuff?" Waller said that his comment startled Haines, and he reacted by cocking back his arm. Waller said he ducked and Haines swung at him and missed. Haines then grabbed Waller on the arm. Waller said he shook off Haines and punched him with his left hand, hitting him in the jaw and causing him to fall to the ground. Waller said that he hit Haines just one time and that he did so in self-defense.

According to Waller, as Haines was getting himself up after being floored by the punch, a one-sided donnybrook ensued: Coons came running from the doorway and began kicking Haines in the face multiple times. Delacruz came running out of the bathroom and joined Coons in kicking Haines. Grissom picked up a mop handle and used it to hit Haines in the head multiple times.

Waller maintains that after hitting Haines once in self-defense, Delacruz, Coons, and Grissom began beating him. Waller denied participating in the beating and stated that he left Coons' apartment once the beating had ceased. At the most, Waller's testimony, if believed, established that he did not participate in any conduct constituting felony murder or aggravated kidnapping. But his testimony certainly does not establish an absolute defense to being convicted of either crime. For a self-defense instruction to have been factually appropriate in this case, Waller would have had to acknowledge that he engaged in conduct constituting either felony murder or aggravated kidnapping but that his conduct was justified because he was acting in self-defense. See *State v. Kirkpatrick*, 286 Kan. 329, 339, 184 P.3d 247 (2008) ("Perfect self-defense is a concept based on justification or excuse and operates as a complete defense. It applies broadly to all crimes involving the use of force against another."), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013). Waller's testimony failed to establish a valid self-defense claim to the charged crimes and there is no other evidence in the record that supports this claim.

Accordingly, the trial court did not err in failing to give a self-defense instruction.

## DENIAL OF MISTRIAL MOTION

Next, Waller argues that the trial court abused its discretion by failing to grant his motion for a mistrial based on the courtroom actions of Grissom during his cross-examination.

On appeal, a trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. Judicial discretion is abused if the decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Harris*, 293 Kan. 798, 814, 269 P.3d 820 (2012).

### A. *Applicable Facts*

During Grissom's cross-examination, the following exchange took place:

"Q. [Defense Counsel:] Okay. You also told the officers you didn't take anything from that apartment, correct?

"A. Yeah, but I turned around and I told the truth. I told that I . . . took the wallet. I admitted to what I did. I stepped up, I've been a man. And I mean, I could do a lot of things. I could pinpoint the blame on him, I could have came out with a story, I could tell you guys so many things.

"Q. But that's not what I'm asking you.

"A. I could tell you so many things—

"The Court: Just a second.

"A.—but I'm telling you the truth.

"The Court: Just a second.

"A. And I can only tell you what I know. That's it. That's all I can do. What they did afterwards, I left. I don't know how he died, I don't know what happened. I still don't know. I don't want to know.

"The Court: Okay.

"[Defense Counsel]: Objection, judge.

"The Court: Just take a second and compose yourself, Mr. Grissom.

"A. No, man, I live everyday over this shit, man. I didn't do none of this shit. I don't have to sit up here and go through this every day.

"The Court: Just a second. Just calm down. Take a drink of water.

"A. They already ruined my life. I have no friends, I have no place to go. Do you feel like—"

At this point, the trial court dismissed the jury to the jury room. The record indicates that after the jury left the courtroom, the following exchange took place:

"The Court: Why don't we take about a 10-minute recess. Just go out in the hallway, Mr. Grissom, and calm down a little bit. You're doing fine.

"The Witness: I'm hurt, man. This is bullshit.

"The Court: Go out in the hallway.

"The Witness: I go to see Josh every week, man. You all, I don't know what the hell you all did, man. Don't put me in ya-all's shit. Man up, man. Man up. If you're going to do it, man up. I didn't do shit, man. If I could have saved him I would. I'm not a hero. I got my own life to try to fend.

"[Defense Counsel]: Judge, I, I'd object.

"Witness: Shit."

The record indicates that at this point Grissom was removed from the courtroom. After taking a 10-minute recess, court was reconvened without the jury present. The following exchange then took place:

"[The Court:] Counsel, I intend instructing the jury to disregard any statements of the witness made after the last question of [defense counsel] as the statements were not in response to a direct question of [defense counsel]. So at this point I need any recommendations or statements of counsel as to what they desire the court to do additionally, if anything, and also would like to know whether we are finished with the examination of Mr. Grissom or are we going to continue.

"[Defense Counsel]: Well, Your Honor, at this point I, I would just, I would like to, because, because the transcript will be, will not show volume and pitch and things like that I'd like to just put on the record that the witness was yelling, the microphone was on, and so that the statements of, 'you got to man up, you got to man up,' were loud, loud enough that it appears to me that the jury, who was still going back to the jury room, would have, may have heard that.

"Judge, at this stage I'm going to request a mistrial. I think it's, there's a significant possibility that the jury has been tainted by the, by the outburst."

The trial court then asked the prosecutor for comment. The prosecutor stated that he believed giving the jury a curative instruction regarding Grissom's statements would be sufficient. Defense counsel responded:

"Well, judge, I, you know, it's the old analogy of unring, unringing the bell. The initial part of the outburst was probably something that could have been cured. My biggest concern is the, the witness yelling at my client, 'you need to man up, you need to man up.' Clearly it is an indication or may be seen by the jury as some sort of indication of, of knowledge of guilt beyond what he testified about previously. And judge, I just don't think that can be cured.

"The Court: Clearly Mr. Grissom lost control of his emotions. The court attempted to have the jury removed when it became clear an issue was arising.

"As I recall, by the time the statements of defense counsel is specifically objecting to, the jury had already left the courtroom. That is my view of the situation, and I obviously cannot say whether those statements in question, about the manning up, were heard or not. Obviously at that point Mr. Grissom was speaking in an extremely loud tone of voice.

"I am not going to declare a mistrial at this time. I have faith that the jury will follow the orders or the directions of the court and we will proceed at this time."

The trial court then instructed Grissom that if he had another outburst, he would be in danger of being found in direct contempt of court and if he needed a break, the court would take a break. Defense counsel then stated:

"Judge, one more thing before we bring the jury back just to make sure the record was clear. I believe the bailiff was actually in the jury room with the door closed at some point during Mr. Grissom's outburst. I would ask the court to inquire if she was able to hear any statements which would then have been heard by the jury.

"The Bailiff: You could hear the noise, but it wasn't audible. You, you couldn't hear what was being said."

The jury was then brought back into the courtroom where the trial court addressed the jury:

"The last question asked by [defense counsel] was: 'Okay, you also told the officers you did not take anything from the apartment, correct?' That was the last question she asked.

"You are hereby directed by the court to disregard any statements made by the witness following that. By raise of hand, do you all believe you will be able to follow the order of the court and do not consider anything you heard following that in your consideration of the case? All the jurors have answered in the affirmative."

The trial then resumed with defense counsel finishing her cross-examination of Grissom.

After his jury trial, Waller filed a motion for a new trial in which he argued, among other things, that Grissom's outburst on the witness stand deprived him of a fair trial. In his motion, Waller stated:

"The defendant's right to a fair trial was prejudiced by the outburst of witness Grissom in the presence of the jury, the continued loud accusations of guilt by Grissom towards the defendant, and the subsequent denial of the defendant's motion for mistrial. As the court is aware and the record reflects, during cross examination of Mr. Grissom, Mr. Grissom expressed extreme emotional distur-

bance—crying, screaming, getting of [*sic*] the witness stand, etc. Much of the display was in the presence of the jury. As the jury was rushed from the court room, the witness left the witness stand yelling 'you did it man, man up and take your punishment,' or words to that effect. The witness continued to yell at the top of his lungs and approach [*sic*] the defendant causing [the prosecutor] to physically put himself between the witness and the defendant and physically escort the witness from the court room in addition to numerous deputies entering the court room for obvious security reasons. Even events that occurred once the jury was returned to the jury room could still hear [*sic*] the disturbance according to information from the bailiff even if the exact words were not discernible. However, for the purposes of the record, [defense counsel] was able to hear through out the course of the trial discussions of the jury during breaks and was able to distinguish specific words and topics of conversation leading to the inference that the jury may have been able to discern the content of Mr. Grissom's statements in addition to perceiving the abnormal disturbance of the trial."

At sentencing, Waller did not put on any evidence or raise any new arguments to support his motion for a new trial. The trial judge addressed the issue of Grissom's outburst from the bench:

"As far as the issues for motion for new trial, the court will rest on its previous rulings. Although I will note the one interesting situation involves the activities of the one witness in court. And for the record the court will indicate I am confident in my mind the jury was removed from the courtroom prior to anything of a prejudicial nature taking effect. That, in fact, the outburst of the witness primarily occurred, or anything of, what the court would consider significance occurred after the jury had left the courtroom. Certainly it may have been possible they could have heard noises as it was indicated by the bailiff. There were, she was not able to discern in the jury room what was occurring other than noises were occurring."

### B. *Applicable Law*

Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or

other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011)..

In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551.

The analysis of the first question varies with the·nature of the alleged misconduct, such as when the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error. 292 Kan. at 551. Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may examine the entire record. The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right. To declare a nonconstitutional error harmless, the appellate court must apply K.S.A. 60-261 and K.S.A. 60-2105 to determine if there was a reasonable probability that the error affected the trial's outcome. And if the fundamental failure infringes on a right guaranteed by the United States Constitution, the appellate court applies the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Ward*, 292 Kan. at 569.

When it became clear that Grissom was losing. control of his emotions and failing to respond with appropriate answers to defense counsel's questions, the judge quickly intervened and dismissed the jury to the jury room while trying to calm Grissom. Prior to the jury leaving the courtroom, Grissom made comments indicating that he could have made up a story which shifted blame more towards Waller and less towards himself but that he declined

to do so and was telling the truth at trial. Grissom also indicated that he did not know how Haines was killed or what the other men did to him after he left. These statements were entirely consistent with Grissom's testimony at trial, and, therefore, we do not believe these statements caused Waller any undue prejudice.

The record indicates that after the jury left the courtroom, Grissom yelled at Waller: "Man up, man. Man up. If you're going to do it, man up." This statement, implying that Waller should take responsibility for Haines' death, was clearly prejudicial. But the judge stated that he was confident that the jury was out of the courtroom before Grissom made the statement, and the comments from the bailiff indicated that the statement was not discernible from inside the jury room. Once the jury returned to the courtroom, the judge admonished the jurors to disregard all of Grissom's comments occurring after defense counsel's last question. Furthermore, all of the jurors indicated that they would not consider the comments in their consideration of the case.

The trial court took appropriate curative actions which addressed the prejudicial conduct that occurred at Waller's trial and properly concluded that granting a mistrial would have been an excessive remedy. In fact, the trial court's decision to deny Waller's request for a mistrial was consistent with numerous cases involving misconduct by witnesses where a mistrial was requested and denied. See *State v. Leaper*, 291 Kan. 89, 98-101, 238 P.3d 266 (2010) (reviewing cases from other jurisdictions involving witness misconduct). Based on a review of the entire record, we conclude that Grissom's outburst was not significant enough to have affected the trial's outcome. Waller had the benefit of the judge's admonition to the jury to disregard Grissom's improper comments. Furthermore, it appears that the jury was not influenced by the outburst considering that it did, in fact, acquit Waller of aggravated robbery. Accordingly, we conclude that the trial court did not abuse its discretion by denying Waller's motion for mistrial.

## CUMULATIVE ERROR

Waller argues that his convictions should be reversed due to cumulative error. Cumulative trial errors, when considered collec-

tively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Smith*, 296 Kan. 111, 134, 293 P.3d 669 (2012). Notably, "[c]umulative error will not be found when the record fails to support the errors raised on appeal by the defendant." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). A single error cannot constitute cumulative error. *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012), *cert. denied* 134 S. Ct. 148 (2013).

In making his cumulative error argument, Waller relies on the issues addressed above, none of which constituted error. Furthermore, in his brief, Waller raises numerous alleged errors in passing, which he claims added up to deny him a fair trial. However, he failed to brief each of these individual claims. An issue not briefed by the appellant is deemed waived and abandoned. *State v. Holman*, 295 Kan. 116, 125, 284 P.3d 251 (2012); see also *State v. Anderson*, 291 Kan. 849, 858, 249 P.3d 425 (2011) (A point raised incidentally in a brief and not argued therein is deemed abandoned.). Accordingly, Waller's cumulative error argument—based almost entirely on alleged errors that were never briefed on appeal—must fail.

### JUVENILE ADJUDICATION

Next, Waller argues that his prior 1999 juvenile adjudication for aggravated battery should not have been used to determine his criminal history score because, under *In re L.M.*, 286 Kan. 460, 186 P.3d 164 (2008), he was denied his right to a jury trial at the time of his adjudication.

This argument has been addressed and decided against Waller's position in *State v. Fischer*, 288 Kan. 470, 473, 203 P.3d 1269 (2009). In *Fischer*, the defendant argued that *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003), needed revisiting because of this court's subsequent decision in *In re L.M.* In *Hitt*, this court held that juvenile convictions could be used to calculate criminal history scores without violating *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). *Hitt*, 273 Kan. at 236. *In re L.M.* held that juveniles

have a constitutional right to a jury trial, but this court noted that "[t]his right will apply only to cases pending on direct review or not yet final on the date of filing this opinion." 286 Kan. at 473-74. The *Fischer* court further clarified the *In re L.M.* holding by noting:

"[W]e find that the holding in *Hitt* remains valid for all juvenile adjudications that were final on June 20, 2008, the date *In re L.M.* was filed. Because Fischer's juvenile adjudications were final, they were 'prior convictions' under the *Apprendi* exception, and the district court properly included them in [Fischer's] criminal history scoring." 288 Kan. at 475.

Likewise, Waller's juvenile adjudication was final before June 20, 2008. Therefore, his argument fails.

## DOUBLE JEOPARDY

Waller argues that his convictions and sentences for felony murder (based on the underlying felony of kidnapping) and aggravated kidnapping constitute multiple punishments for the same offense (*i.e.*, are multiplicitous) and thereby violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

Whether convictions are multiplicitous raises a question of law over which this court's review is unlimited. *State v. Simmons*, 282 Kan. 728, 743, 148 P.3d 525 (2006); *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Waller's multiplicity argument concerning felony murder has been repeatedly rejected by this court. See, *e.g.*, *State v. Jefferson*, 297 Kan. 1151, Syl. ¶ 10, 310 P.3d 331 (2013) ("Convictions of felony murder and criminal discharge of a firearm at an occupied vehicle or dwelling are not multiplicitous even when the charges arise from the same conduct and involve the same victim."); *State v. Pham*, 281 Kan. 1227, 1262-63, 136 P.3d 919 (2006) (inherently dangerous felony statute, K.S.A. 21-3436, states legislature's intent to allow cumulative punishment for felony murder and inherently dangerous felonies). Both kidnapping and aggravated kidnapping are considered inherently dangerous felonies for felony-murder purposes; thus, Waller could be properly convicted and sentenced for both felony murder and the underlying felony supporting the felony-murder charge without violating the Double Jeopardy

Clause. See *Missouri v. Hunter*, 459 U.S. 359, 368-69, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983) ("Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger* [*v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)], a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.").

Affirmed.