IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,753

STATE OF KANSAS,
*Appellee*,

v.

DANE OWENS,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 2020 Supp. 60-460(d)(3), the contemporaneous statement exception to the hearsay rule, allows a district court judge to admit testimony of a declarant who is unavailable as a witness, if the declaration was made at a time when the matter had been recently perceived by the declarant, while the declarant's recollection was clear, and the declaration was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort.

2.

K.S.A. 60-445 authorizes the district court to exclude relevant evidence if its probative value is substantially outweighed by the risk of unfair prejudice. But Kansas law favors the admission of relevant evidence, and the exclusion of relevant evidence under K.S.A. 60-445 is an extraordinary remedy that should be used sparingly.

3.

Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute

1

creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. On appeal, the court's abuse of discretion inquiry is divided into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?

4.

The State committed prosecutorial error in its closing argument by asserting that the defendant's medical records reflected instances where the defendant missed scheduled appointments, but the admitted records did not substantiate this argument. By doing so, the State improperly argued facts not in evidence.

5.

This court may reverse a defendant's convictions for cumulative error when the totality of the circumstances demonstrate that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial.

6.

Kansas' criminal restitution scheme implicates a defendant's right to trial by jury in section 5 of the Kansas Constitution Bill of Rights by converting restitution orders, in which a judge determines the damages proximately caused by the criminal act, into civil judgments, thus bypassing the traditional function of juries to determine civil damages.

2

Therefore, a criminal defendant will not be faced with a civil judgment for criminal restitution unless it has been obtained separately through a civil cause of action.

Appeal from Sedgwick County District Court; KEVIN J. O'CONNOR, judge. Opinion filed October 15, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: A jury convicted Dane Owens of first-degree felony murder and aggravated burglary in connection with the shooting death of his ex-girlfriend, Rowena Irani. Owens appeals, arguing that multiple evidentiary, trial, and prosecutorial errors require reversal of his convictions.

However, upon thorough examination of the record and briefing, we determine that only two potential errors occurred during the proceedings. First, the prosecutor committed error by referring to a fact not in evidence during closing argument. But this error primarily affected Owens' defense to first-degree, premeditated murder, and the jury acquitted Owens of this offense. This fact, along with other circumstances, demonstrate the prosecutorial error was harmless.

Second, we presume, without deciding, that the State's failure to disclose the findings of its pseudo-expert witness before trial constituted a fundamental failure in the proceedings. However, the presumed error did not inhibit Owens' defense, and the trial court implemented ameliorative measures to mitigate potential prejudice, which made it

3

possible to proceed with the trial without injustice. Thus, the record confirms the district court did not abuse its discretion in denying Owens' motion for mistrial.

These two errors were not interrelated in a way that amplified their prejudicial force when viewed together. Whether viewed independently or in the aggregate, these errors did not deprive Owens of a fair trial.

As for Owens' sentence, the district court's restitution order does implicate section 5 of the Kansas Constitution Bill of Rights under the current statutory scheme. Several statutory provisions serve to convert a district court's restitution order, in which a judge determines the damages proximately caused by the criminal act, into a civil judgment. Through this process, the statutes bypass the traditional function of Kansas juries to determine civil damages. However, based on our holding in *State v. Arnett*, 314 Kan. ___, (No. 112,572, this day decided), the constitutional infirmity is cured by severing the offending statutory provisions. By severing these provisions, Owens will not be subject to a civil judgment for his criminal restitution order, unless it is obtained separately through a civil cause of action. Accordingly, the district court's restitution order satisfies constitutional requirements.

For these reasons, we affirm Owens' convictions and restitution order.

FACTUAL AND PROCEDURAL BACKGROUND

On October 3, 2016, Owens entered the home of his ex-girlfriend Rowena and fired a single bullet, killing Rowena. Police arrested Owens the same day and charged him with premeditated first-degree murder—or felony murder in the alternative—as well as aggravated burglary.

4

*Pretrial Evidentiary Issues*

Before trial, the State moved to determine the admissibility of hearsay statements by Rowena. The State sought to introduce testimony from Rowena's brother, Rooshad Irani, about statements Rowena had made to him—both in person and via text message—concerning her relationship and breakup with Owens.

Specifically, the State sought to admit Rooshad's testimony that Rowena told him that Owens said he had "dug a hole" for an ex-girlfriend after she broke up with him. The State argued this evidence was relevant in establishing Rowena's state of mind at the time of the shooting. Owens opposed the admission of this "dug a hole" testimony on several grounds. The district judge found the statements admissible under K.S.A. 2020 Supp. 60-460(d), the contemporaneous statement hearsay exception, because they went to Rowena's state of mind and the fact that Owens would not have been welcome in her home. The district judge recommended a limiting instruction.

The State also sought to admit the following text messages between Rowena and Rooshad:

| Sender | Message Content |
| --- | --- |
| Rooshad | "You and dane working a few things out?"<br>"His fb popped up as complicated relationship." |
| Rowena | "lord"<br>"he called yesterday saying he wanted to work it out and to give him a chance all that i told him to give me some time to think"<br>"mom texted me saying she had a strong feeling he was going to physically abuse me if i went back" |

| Sender | Message Content |
|---|---|
| Rooshad | "Ok? Bas? That's it?" |
| Rowena | "mhm" |
| Rooshad | "Kk"<br>"Was it a decent convo or was he being an ass" |
| Rowena | "it was alright i guess he just kept trying to justify everything"<br>"saying i need to trust him and let things flow and that he's not telling me to give anything up"<br>"my thing like why go back and then have the same feelings in a month" |
| Rooshad | "Yup"<br>"Don't do it" |
| Rowena | "i have therapy tomorrow so i'm kinda just waiting to talk to him about it" |
| Rooshad: | "Just leave it alone and when he asks tell him you thought long and hard and decided it's best for you 2 to go your separate ways"<br>"Do I need to intervene?" |
| Rowena | "no"<br>"not yet anyway" |
| Rooshad | "K" |
| Rowena | "what's the worse that'll happen hell take a rifle and shoot me [emoji smiling with bead of sweat on forehead]" |
| Rooshad | "Shut up" |

| Sender | Message Content |
|---|---|
| | |
| Rowena | [three emojis smiling with beads of sweat on foreheads] |
| Rooshad | [sends a screenshot of texts Owens sent him asking about Rowena] |
| Rowena | "story of my life" |
| Rooshad | "Yup" |
| Rowena | "getting on my fuckin nerves" |
| Rooshad | "Yup" |
| Rowena | [emoji smiling with bead of sweat on forehead; gun emoji pointed at other emoji] |

The State argued these texts were relevant to Rowena's state of mind. Owens argued they were not probative of the mindset the State was attempting to establish because the emojis suggested Rowena truly did not think Owens would shoot her and, instead, she was just annoyed with him. Further, Owens argued "under the facts of this case, where [he was] accused of intentionally shooting her in the head, that those are certainly more prejudicial than probative." The district judge ruled that the texts were admissible.

*Prosecutor's Opening Statement*

The case proceeded to a jury trial. In its opening statement, the State informed the jury that Detective Robert Chisholm had tried on Owens' sling (which Owens wore following shoulder surgery on September 29, 2016) and used a gun to reconstruct or test

Owens' description of how he wielded the gun inside the sling at the time of the shooting. Based on this reconstruction, the State said Detective Chisholm would testify that Owens' account of the shooting was not feasible.

After opening statements, Owens moved for a mistrial, arguing the State committed discovery violations by failing to disclose Detective Chisholm's reconstruction analysis the prosecution had described in opening remarks. The State argued there was no discovery violation; the gun and the sling would both come in as evidence, and the detective could do this reenactment in front of the jury. The State further argued the jury itself could do the same with the gun and sling once it deliberated in the jury room. The district court denied the request for mistrial.

*Trial Evidence*

During the trial, Detective Chisholm testified about his interrogation of Owens the day of the shooting. According to Chisolm, Owens said he drove his truck to Rowena's neighborhood, parked, and walked to her home. He opted not to park in the Irani family's driveway because he did not want them to call the police. Once there, he saw one of the family's dogs in the front yard. He let the dog inside and followed it into the home. After entering the home, Owens said Rowena "came around the corner, he was startled, she was startled, and the gun just went off." Owens then admitted he pulled the trigger. When Detective Chisholm asked why, Owens "kind of shrug[ged] his shoulders" and said "I mean—I mean, pretty much accepted the fact that we were done." Owens claimed he "wasn't trying to hurt anyone," and while admittedly angry, he had typically been able to control his emotions. But when asked about the breakup with Rowena, Owens said he was "'blindsided'" by it and was tired of being "'fucked over.'" He said he took the gun to Rowena's house "so she would take him seriously."

Detective Chisholm said Owens informed law enforcement that he threw his handgun, magazine, and Rowena's cell phone in ponds near his parents' house. Police were able to fish out the gun, a .45 caliber Smith and Wesson. Detective Chisholm testified the gun had a 7-pound trigger pull and a trigger safety preventing the weapon from firing unless a finger was on the lower part of the trigger. Owens told Detective Chisholm that he always carried the handgun around, but it was usually in a backpack. Owens said he had the gun inside the sling he was wearing on his right arm when he entered Rowena's home. He also informed Detective Chisholm that he is right-handed but shoots left-handed.

Before trial, Detective Chisholm decided to see if it was feasible to hold the gun inside the sling; he tried on the sling and held a gun inside it in the way Owens described. Detective Chisholm went through this same reconstruction while on the stand. Through this process, Detective Chisholm determined the gun's slide would have been obstructed by the sling. He reasoned that, if the slide was obstructed by the sling, the shell casing would not have ended up where it was ultimately found in the Iranis' home. Further, Owens told Detective Chisholm that as he left the Iranis' home, he had a live bullet in the gun's chamber. To Detective Chisholm, this suggested the gun's slide likely was not obstructed at the time of the shooting. Detective Chisholm also observed no burns, abrasions, or other marks on the sling indicating that a gun had been fired inside it.

During Detective Chisholm's testimony, the State also admitted into evidence the video of Owens' interrogation by police. On this video, Owens provides detectives with his account of the shooting and demonstrates how he wielded the gun in his sling. Owens also admitted during the interview that he sometimes told lies for attention, like when he claimed that he "dug a hole'" for a previous ex-girlfriend after she broke up with him. The district judge overruled Owens' objections to these "dug a hole" comments.

On cross-examination, Detective Chisholm acknowledged that Owens reported dealing with shoulder and back injuries, posttraumatic stress disorder (PTSD), depression, and traumatic brain injury. Owens said he had been prescribed medication for some of his mental health issues and was seeking treatment from the Veterans Administration in Wichita and a therapist in Manhattan.

Rooshad testified for the State. He said Rowena told him she broke up with Owens on September 23, 2016. He testified that Owens texted him on September 27 and 28 about Rowena. Then, on Friday September 30, Rooshad texted Owens, "'You and my sister are done. Stop bothering her via text, Facebook, and phone calls or she will file harassment charges. It is over. Move on. Thank you.'"

Rooshad also said that on September 23, 2016, Rowena told him that she spoke with Owens and that Owens said he wanted to get married and start a family soon, which "freaked" Rowena out. Rooshad testified that according to Rowena, Owens then said that "well, if that freaks you out, then you should know what I have done when I was at war. I have shot and killed men, women, and children." Then, Owens "made a comment of having a previous girlfriend in his life who had broken up with him a number of years prior, and that he had dug a hole for her with a shovel in his truck." Rooshad said Rowena took these statements "seriously."

The State also admitted a recorded phone call with Owens' mother from October 3, 2016. The State was supposed to have redacted from the call certain law enforcement phone numbers, a hold time, and Owens' mother's request for an attorney when asked if she would consent to a search of her home. But the copy that was played for the jury was unredacted. In response, Owens renewed his motion for a mistrial. The State opposed the motion, arguing that "frankly, putting on the fact that a parent doesn't want to have officers search their home, car, or whatever, without a lawyer, without talking to somebody first . . . it certainly does not prejudice the defendant." The district judge

found the material that was supposed to be redacted was not prejudicial to Owens and denied the motion. The district judge offered to give a limiting instruction, but Owens declined.

The defense put on several witnesses of their own. Sergeant First Class Steve Frye—Owens' former Army squad leader—testified that at 19 years old, Owens saw active combat in Afghanistan and encountered multiple IEDs. On cross, he said Owens was highly trained with firearms and was instructed to always treat them as loaded and never point them at something you do not intend to kill. SFC Frye also testified that Owens was a left-handed shooter.

Owens' orthopedic surgeon testified about the September 29, 2016 outpatient surgery performed on Owens' right shoulder. The surgeon testified the surgery did not affect the function in Owens' right hand, or his left hand for that matter. The defense also admitted two sets of Owens' medical records: one from the Veterans Administration, and the other from Lafene Health Center in Manhattan.

Finally, Owens' mother testified that Owens' demeanor changed when he returned from Afghanistan. He would be startled if people touched him and did not like to ride in the front seat of vehicles. While in vehicles, he was constantly observing the road, as if looking for IEDs. Owens was prescribed medication to deal with these issues; the medication helped, but when Owens was off the medication, he was "jumpy," "agitated," and "seemed to be paranoid."

*Jury Instructions, Closing Argument, and Verdict*

During the jury instruction conference, the district judge proposed the following aggravated burglary instruction:

"The defendant is charged with aggravated burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant entered a dwelling.
2. The defendant did so without authority.
3. The defendant did so with the intent to commit aggravated assault therein.
4. At the time there was a human being in the dwelling.
5. This act occurred on or about the 3rd day of October, 2016, in Sedgwick County, Kansas.

"The State must prove that the defendant committed the crime intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State.

"The elements of aggravated assault are as follows:

1. The defendant knowingly placed Rowena Irani in reasonable apprehension of immediate bodily harm.
2. The defendant did so with a deadly weapon.
3. This act occurred on or about the 3rd day of October, 2016, in Sedgwick County, Kansas.

"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about.

"No bodily contact is necessary.

"A deadly weapon is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury. An object can be a deadly weapon if the user intended to convince a person that it is a deadly weapon and that person reasonably believed it to be a deadly weapon."

12

Owens did not object to this instruction.

The district judge also included a limiting instruction addressing the "dug a hole" comment.

> "Evidence has been admitted tending to suggest that the defendant claimed to have considered an act of violence against a prior girlfriend. No evidence has been admitted to establish that these acts actually occurred.

> "Evidence that such a statement was allegedly made by the defendant to Rowena Irani may be considered solely for the purpose of establishing the nature of Ms. Irani's relationship with defendant and her state of mind in late September 2016 to October 3, 2016. It is not to be considered by you for any other purpose."

During Owens' closing, he did not deny shooting Rowena but argued that the shooting was "a terrible accident" and asked for a voluntary manslaughter conviction. He pointed to his post-combat mental health issues to support his argument that the shooting was unintentional because he was jumpy and paranoid.

During closing rebuttal, the State argued for an intentional first-degree murder conviction. The prosecutor addressed Owens' argument that his PTSD, traumatic brain injury, and mental health issues contributed to the shooting. The prosecutor argued that the medical records demonstrated Owens had not consistently sought treatment and had missed scheduled appointments. The prosecutor also encouraged the jury to consider all the evidence of premeditation and challenged Owens' account of the shooting.

The jury convicted Owens of first-degree felony murder and aggravated burglary. Owens was acquitted of first-degree premeditated murder. The district judge sentenced Owens to a hard 25 life sentence plus 43 months and ordered Owens to pay $7,470.64 in restitution. Owens appealed his convictions and restitution order.

*The District Judge Did Not Abuse His Discretion in Admitting Challenged Evidence*

Owens first challenges the district judge's admission of two sets of statements. The first statements are Rooshad's testimony that Rowena told him about Owens' comments about "digging a hole" for an ex-girlfriend. The second statements include a text exchange between Rowena and Rooshad where Rowena said, "[M]om texted me saying she had a strong feeling he was going to physically abuse me if I went back," and texts from the same chain between Rowena and Rooshad involving the emojis and the comment "what's the worse that'll happen hell take a rifle and shoot me." Owens claims both sets of statements constituted inadmissible hearsay and were unduly prejudicial.

*Standard of Review*

"'This court reviews a trial court's determination that hearsay is admissible under a statutory exception . . . for an abuse of discretion.' *State v. Summers*, 293 Kan. 819, 827, 272 P.3d 1 (2012). 'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.' *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 (2015)." *State v. Lemmie*, 311 Kan. 439, 449-50, 462 P.3d 161 (2020).

"'"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible"' unless one or more statutory exceptions apply. K.S.A. 60-460; *State v. Brown*, 258 Kan. 374, 381, 904 P.2d 985 (1995)." *State v. Page*, 303 Kan. 548, 556-57, 363 P.3d 391 (2015).

As with hearsay challenges, a district judge's decision whether to exclude evidence as unduly prejudicial under K.S.A. 60-445 is reviewed for an abuse of discretion, and the

burden of proof is on the party alleging an abuse of discretion. *State v. Satchell*, 311 Kan. 633, 640-41, 466 P.3d 459 (2020); *State v. Huddleston*, 298 Kan. 941, 962, 318 P.3d 140 (2014).

### *The "Dug a Hole" Comments*

The State sought to admit Rooshad's testimony that Rowena told him that Owens said he "dug a hole" for a previous ex-girlfriend. The State offered this testimony to establish Rowena's state of mind and the fact that she would not have willingly let Owens into her home—which supported the "entering a dwelling without authority" element of aggravated burglary. Owens objected to the admission of this testimony, claiming it did not fit within the statutory hearsay exception, particularly when Rooshad could be motivated by animosity to distort the statements. Owens also argued the evidence should be excluded because it was not relevant and was more prejudicial than probative.

The district judge found the testimony admissible under K.S.A. 2020 Supp. 60-460(d) because it went to Rowena's state of mind and the fact that Owens would not have been welcome in her home. The district judge ruled:

> "So I do think—and I understand that the defense doesn't want to be defending against another alleged incident that may or may not have occurred. And I also understand and appreciate why the State wants to introduce this. It goes to her state of mind. It also goes to why she would have said, 'I don't want to have anything to do with you anymore.'

> "And it also goes to the fact that he would not have had permission to go into her residence, which may be an issue, because oftentimes, a boyfriend or a girlfriend would have permission to come into a residence of a parent or a family member. So under the analysis, under 60-460(d), I'm going to find that the statement is admissible."

Rooshad's testimony about Owens' "dug a hole" comment may qualify as double hearsay. Therefore, each layer must be analyzed to determine its admissibility. See K.S.A. 60-463 ("A statement within the scope of an exception to K.S.A. 60-460 shall not be inadmissible on the ground that it includes a statement made by another declarant and is offered to prove the truth of the included statement if such included statement itself meets the requirements of an exception.").

The first layer is Owens' declaration to Rowena that he "dug a hole" for an ex-girlfriend. The State never offered this statement for the truth of the matter asserted—that is, to argue that Owens did in fact dig a grave for an ex-girlfriend. Indeed, the State willingly agreed to an instruction that "[n]o evidence has been admitted to establish that these acts actually occurred." Thus, this first layer is not hearsay. See K.S.A. 2020 Supp. 60-460 (hearsay evidence is "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated").

The second layer—Rowena's declaration conveying Owens' "dug a hole" comment to her brother—is, however, hearsay because it was offered by the State to establish that Owens did indeed tell Rowena he dug a hole for his ex-girlfriend. The district judge found the evidence admissible under K.S.A. 2020 Supp. 60-460(d), which creates an exception to the general rule excluding hearsay for certain contemporaneous statements, including:

> "A statement which the judge finds was made: (1) While the declarant was perceiving the event or condition which the statement narrates, describes or explains; (2) while the declarant was under the stress of a nervous excitement caused by such perception; or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2020 Supp. 60-460(d).

16

On appeal, Owens argues this conversation was inadmissible hearsay because the State did not establish that the statement was "(1) contemporaneous, made by Rowena when the matter had been recently perceived and while her recollection was clear, and (2) made in good faith with no incentive to falsify or to distort." Further, Owens argues that "[a]*ny probative value was outweighed by unduly prejudicial effect*."

Ultimately, Owens fails to establish that the district judge abused his discretion by admitting the "dug a hole" evidence under K.S.A. 2020 Supp. 60-460(d) and finding that the probative value of the testimony was not substantially outweighed by the risk of unfair prejudice under K.S.A. 60-445.

The district judge's admission of the testimony under K.S.A. 2020 Supp. 60-460(d) did not constitute a mistake of law or fact; nor was it arbitrary, fanciful, or unreasonable. *Lemmie*, 311 Kan. at 449-50. As noted, K.S.A. 2020 Supp. 60-460(d)(3) provides for admission of testimony where the statement is made by a declarant: (1) who is unavailable as a witness; (2) at a time when the matter had been recently perceived and the declarant's recollection clear; and (3) with no incentive to falsify or distort.

The record establishes that the challenged evidence satisfies all three statutory requirements for admission. First, Rowena was unavailable because she had been murdered. See *State v. Robinson*, 293 Kan. 1002, 1025, 270 P.3d 1183 (2012) (concluding that murder victim "clearly was unavailable as a witness").

The record also supports the district judge's finding that the statements were contemporaneous. The State's evidence indicated that Rowena told Rooshad about Owens' "dug a hole" comments about one week after Owens made them to her. No evidence suggests Rowena's recollection was unclear after having perceived Owens' statements several days prior. In fact, the testimony established that Rowena took Owens' statements seriously, and it is reasonable to infer from this evidence that the statements

17

made a lasting impression upon her. The district judge did not abuse his discretion by concluding that Rowena recounted this conversation to Rooshad "at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear." K.S.A. 2020 Supp. 60-460(d)(3); see *State v. Evans*, 313 Kan. 972, 986-87, 492 P.3d 418 (2021) (statements made in the year leading up to murder were "close enough in time to be considered contemporaneous.").

Finally, Owens speculates that Rowena might have had incentive to distort the statements to justify to her brother the decision to end the relationship with Owens. However, Rooshad's testimony reasonably inferred that Rowena's account was genuine and she took Owens' statements seriously. No evidence suggests Rowena made these statements in bad faith or with an incentive to falsify or distort them. See *Robinson*, 293 Kan. at 1026 (concluding district court did not abuse discretion where evidence did not support declarant's assertion that declarant made statements in bad faith). We find no error in the admission of this evidence under K.S.A. 2020 Supp. 60-460(d)(3).

With respect to the probative value and undue prejudice analysis, K.S.A. 60-445, provides:

> "Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

"While [K.S.A. 60-445] talks only of the risk of unfair surprise, it has long been applied much more broadly—excluding evidence if its probative value is substantially outweighed by the risk of unfair prejudice." *Satchell*, 311 Kan. at 640. In reviewing this issue, we remain mindful that Kansas law favors the admission of relevant evidence, and

18

the exclusion of relevant evidence under K.S.A. 60-445 is an extraordinary remedy that should be used sparingly. *State v. Ross*, 310 Kan. 216, 224, 445 P.3d 726 (2019).

Here, the district judge found the testimony was probative because it tended to establish Rowena's state of mind and that she would not have allowed Owens into her home. In turn, such evidence was probative of the third element of aggravated burglary, whether defendant entered an occupied dwelling without permission. See K.S.A. 2020 Supp. 21-5807(b)(1) and (c)(2)(A). Owens argues that Rooshad's "dug a hole" testimony was more prejudicial than probative because it suggested to the jury that Owens had a history of violence towards partners, and it had little probative value because Rowena's state of mind was not a material fact in dispute.

We find no abuse of discretion in the district judge's conclusion that the probative value of this testimony was not "substantially outweighed" by the risk of unfair prejudice. First, the district judge correctly observed that Rowena's account of Owens' statements tended to support the conclusion that Rowena would not have allowed Owens into her home, a fact relevant to an essential element of the aggravated burglary count. The State had the burden to prove this essential element at trial, even if Owens did not affirmatively controvert the element or Rowena's state of mind. The testimony was also probative of the nature of the relationship between Rowena and Owens during the days leading up to her death, explaining possible motive for Owens' conduct and behavior. See *Evans*, 313 Kan. at 989 (evidence providing background context of the parties' relationship was probative of defendant's motive that supplied "the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State").

Additionally, the admission of this testimony was not unduly prejudicial. Owens' "dug a hole" story had already been presented to the jury through Owens' interrogation video and Detective Chisholm's testimony, and Owens does not challenge the admission

of this evidence on appeal. So the only new information that came from Rooshad's testimony was that Owens had told Rowena the same story.

The district judge also gave a cautionary jury instruction stating that "no evidence [had] been admitted to establish" that Owens actually dug a hole for his ex-girlfriend. The instruction made clear that "[e]vidence that such a statement was allegedly made" could "be considered solely for the purpose of establishing the nature of Ms. Irani's relationship with defendant and her state of mind in late September 2016 to October 3, 2016." Jurors were directed not to consider this evidence "for any other purpose." See *State v. Dean*, 310 Kan. 848, 862-63, 450 P.3d 819 (2019) (prejudicial effect of defendant's affiliation with gangs may be cured by a limiting instruction); see also *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001) ("The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence.").

Under these facts, the district judge did not abuse his discretion by concluding that the evidence was admissible under K.S.A. 2020 Supp. 60-460(d) or by finding the testimony did not cause unfair prejudice that would "substantially outweigh" its probative value.

*Text Messages Between Rowena and Rooshad*

On appeal, Owens challenges the admission of the following text messages:

> Rowena to Rooshad:  "mom texted me saying she had a strong feeling he was going to physically abuse me if i went back"
> Rowena to Rooshad:  "what's the worse that'll happen hell take a rifle and shoot me [emoji smiling with bead of sweat on forehead]"
> Rooshad to Rowena:  "Shut up"
> Rowena to Rooshad:  [three emojis smiling with beads of sweat on foreheads]

20

Rowena to Rooshad:   in response to Rooshad's screenshot of Owens' texts to
                     Rooshad:
                     "getting on my fuckin nerves"; [emoji smiling with sweat
                     on forehead; gun emoji pointed at other emoji]."

Before trial, the State argued these messages again went to Rowena's state of mind and that she would not have willingly let Owens into her home. The defense argued that the messages showed Rowena was joking and considered the idea that Owens posed a threat preposterous. Also before trial, Owens opposed admission of this text message chain on two grounds. His counsel stated:

"So I have an objection to State's 121 [the pretrial exhibit containing these text messages], twofold:  One, the reference to:  'What's he going to do, take a rifle and shoot me?' If it goes to her state of mind, then her state of mind is, 'What's the worst he could do? It's not going to happen.' And then she laughs about it with three laughing emojis to the point where the emoji is crying.

"And then the following page, it talks about a story of her life being that he's wanting to get back together with her, and that [Owens] is getting on her fucking nerves, and so she wants to shoot herself in the head. I would argue under the facts of this case, where my client is accused of intentionally shooting her in the head, that those are certainly more prejudicial than probative."

At trial, Owens did not make any new arguments objecting to the admission of these texts, but instead "renew[ed] [his] previous hearsay objections." Like Rooshad's testimony, the district judge ruled that the texts were admissible under K.S.A. 2020 Supp. 60-460(d). On appeal, Owens argues that these texts "had limited probative value" and were "cumulative and unnecessary and very prejudicial."

To begin with, Owens' trial objection to the "strong feeling he was going to physically abuse me" text message was only to voice a difference of opinion on how the

21

evidence should be interpreted. Owens did not lodge specific objection to the admissibility of this text message at trial. By challenging the "strong feeling" text as unduly prejudicial on appeal, Owens' argument is akin to objecting on one ground below and arguing a different one on appeal. We have consistently held that such arguments are not preserved properly for appeal. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) ("Recently, we stated that 'the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error.' Specifically, in *Richmond* we refused to allow the defendant to object on one ground at trial and then argue another on appeal. [Citation omitted.]"). Because Owens did not specifically object to this text message communication at trial, the district court was never given the opportunity to fully consider its admissibility. We will not consider Owens' unpreserved arguments about the "strong feeling" text. *State v. Gaona*, 293 Kan. 930, 954, 270 P.3d 1165 (2012) ("If a party fails to make a specific contemporaneous objection to the admission of evidence or testimony at trial, objection to that evidence or testimony is not preserved for appeal.").

Second, the hearsay objection that Owens did preserve is unfounded. The analysis harkens us back to the definition of hearsay:  "Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2020 Supp. 60-460. Most of the remaining messages in the challenged texts were not offered for the truth of the matter asserted because they are not declarations and do not assert any matter. The "what's the worse that'll happen" statement, though ominous, was not offered by the State to show that this was indeed the worst thing that could happen, or that Rowena believed it was the worst thing that could happen. Instead, it was offered as insight to Rowena's state of mind. Furthermore, this was a rhetorical question that did not attempt to establish the truth of any asserted matter.

Similarly, Owens fails to make a case on appeal that the emojis—specifically the smiling one with the bead of sweat and the gun directed at it—contain or express the truth

22

of a matter being asserted. Thus, the emojis cannot be characterized as hearsay statements.

The only message from this group of texts that can be properly characterized as being offered for the truth of the matter asserted was Rowena's statement "getting on my fuckin nerves," which is an assertion that Owens was bothering her. Nevertheless, the district judge found that these messages, to the extent they were hearsay, were admissible under K.S.A. 2020 Supp. 60-460(d), finding: "She is perceiving the matter about which the statements are made while her recollection is clear."

We hold the district judge did not abuse his discretion by concluding that the portions of these texts that were hearsay, if any, were admissible under K.S.A. 2020 Supp. 60-460(d)(3), the contemporaneous statement exception to the hearsay rule. This declaration ("getting on my fuckin nerves") explains Rowena's state of mind moments after Rooshad forwarded her a screenshot of Owens' texts. In turn, this state of mind evidence provided insight into the nature of her relationship with Owens leading up to the shooting. And Owens has not established on appeal that Rowena had incentive to falsify or distort this reaction. Thus, the district court did not abuse its discretion in admitting the text messages under K.S.A. 2020 Supp. 60-460(d)(3).

With respect to the K.S.A. 60-445 probative value and prejudice concerns, we find no abuse of discretion in the district judge's conclusion that the probative value of the texts was not "substantially outweighed" by the threat of unfair prejudice. As with Rooshad's testimony above, the text messages were probative because a juror could reasonably infer from them that Rowena would not have given Owens permission to enter her family's home. The evidence was also probative of Owens' motive. In turn, Owens fails to explain why the emoji text messages were unfairly prejudicial in his brief on appeal. This court cannot independently develop an argument for prejudice on Owens' behalf. See *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018) ("'A point raised

23

incidentally in a brief and not argued therein is deemed abandoned.'"). Accordingly, we conclude the district judge did not abuse his discretion in admitting this evidence.

*The District Court Did Not Abuse Its Discretion by Denying the Mistrial Motions*

Owens next argues the district judge committed reversible error by twice denying his requests for a mistrial. Owens first moved for a mistrial on the first day of trial. He argued the State surprised him during opening argument when it first disclosed that Detective Chisholm had performed a reconstruction using Owens' sling and gun and claimed this reconstruction would show Owens' account of the shooting was implausible.

Owens renewed his motion later in the trial when the State failed to redact the recording of a phone call between a detective and Owens' mother, wherein Owens' mother said she wanted to consult with an attorney before consenting to law enforcement's search of her house. The district judge denied both requests. We address each request in turn.

*Standard of Review*

This court explained the procedure and applicable standard of review for mistrial requests in *State v. Waller*, 299 Kan. 707, 725-26, 328 P.3d 1111 (2014):

> "Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must

24

determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

> "In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking:  (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551."

Generally, where, as here, a defendant alleges the district court erred by not granting a mistrial, the defendant bears the burden of proving that his or her substantial rights to a fair trial were prejudiced. *State v. Sappington*, 285 Kan. 158, 173, 169 P.3d 1096 (2007).

*The First Mistrial Motion*

The portion of the opening statement at issue in Owens' first motion for mistrial is as follows:

> "So Detective Chisholm will tell you a couple of things about the statement that Mr. Owens gives to him. His explanation for everything is that his gun was in the sling, and it just went off. I don't know what happened. It just went off.

> "What you'll also hear him tell Detective Chisholm is that he shoots with his left hand; the one that didn't have the surgery. But on this occasion, the gun was in his right hand, in the sling somehow.

"So what the police did is when Dane was arrested, they took that sling and put it into evidence. They were able to find the gun. They never found the magazine. They never found the live round. They never found Rowena's phone. But they did find the firearm.

"Detective Chisholm has been with the homicide unit probably 25 years. He knows more about guns than most people will, in his experience personally and through law enforcement. But he also sent the gun to the Forensic Science Center for the firearms examiner to look at it and compare it with the bullet that they had found to see what information he could give. And the firearms examiner will tell you that the trigger pull takes seven pounds. . . .

"But what Detective Chisholm did is when he's in the interview with Mr. Owens—and you'll see it—but there's a part where he tries to explain how this gun was in the sling. So Detective Chisholm, on his own time and when he has the gun and has the sling, puts it on him and tries to see if this is feasible. And what he found out is that gun won't fit. And if the gun won't fit, the mechanism to discharge the cartridge wouldn't work right. And you will hear and you will see this as well."

Owens requested a mistrial, stating:

"During the course of the State's opening statement, we were told for the first time that apparently the case agent conducted some experiment on a piece of evidence and then reached certain conclusions that the story couldn't have been the way my client said it because of the way the casing was ejected from the firearm. There has been no report provided on any kind of scientific or experimental testing by the State. I certainly haven't been given so much as an email about it, so I move for mistrial at this time. They've already told the jury about some piece of evidence that I have never been told about. Apparently, it's some kind of test done by the case agent that he hasn't written a report on. I'd be shocked if there wasn't an email from somewhere saying, 'Hey, fellows, this is what I did and this is what happened.' So I believe it's a blatant discovery violation and I move for mistrial."

The State countered that Detective Chisholm had just conducted this reconstruction the Friday before trial began (on the following Tuesday) and it would question Detective Chisholm about this issue on the stand. Further, the State highlighted that both the gun and the sling were going to be admitted as evidence, and Kansas law permitted the jury to take both the gun and the sling back into the jury room where jurors could conduct the same experiment of their own accord, if they wished.

The district judge denied the request for a mistrial, reasoning:

"I don't see it as a scientific experiment. I don't see it as expert testimony; and the remedy for finding this out during opening statement which, again, I would state they could have just had Detective Chisholm testify and done it right there and then, and it could have been something that came to them during the direct examination of Detective Chisholm, with the items here and have him try it.

"But also, then, if the defense wants an opportunity before Detective Chisholm testifies to see what and how he did this examination of the evidence, I will allow for that."

The defense confirmed that it wanted the opportunity to see Detective Chisholm's demonstration and examination before he testified.

On direct examination, the State highlighted Detective Chisholm's familiarity with and expertise in firearms but did not designate him as an expert. Over the defense's objection, Detective Chisholm demonstrated his reenactment for the jury, putting on the sling, holding the gun, and explaining that he did not believe Owens' account of the shooting was true because if the gun were in the sling, the casing would not have ended up on the staircase where crime scene technicians ultimately found it. The defense cross-examined him about his reenactment and conclusions. Detective Chisholm admitted that he "wouldn't say that [he] had any real findings" based on the demonstration. He also

27

observed that there were no burns on the sling, but he admitted the sling was not tested for gunpowder residue.

On appeal, Owens argues that the "surprise" in the State's opening statement was fundamentally unfair because the defense was "unprepared to counter the evidence that the State had just proffered." The State counters that no fundamental unfairness occurred because the evidence the State promised "was no different than what the jury witnessed defendant demonstrating on video during his interview, and no different than what the detective illustrated during his own testimony before the jury."

At trial, the State used Detective Chisholm as more or less a pseudo-expert, outlining his experience with firearms and expertise in their function, despite never formally designating him an expert. Because Detective Chisholm was never officially designated an expert, the State did not disclose to the defense his "demonstration," his qualifications, or any of the underlying grounds or basis supporting the reliability of his opinions. We presume without deciding that the failure to disclose Detective Chisholm's demonstration before trial was a fundamental failure in the proceeding. See *Waller*, 299 Kan. at 725.

Presuming error, we move to the second step of the analysis and determine whether such a fundamental failure "caused prejudice that could not be cured or mitigated through jury admonition or instruction or other means, resulting in an injustice." *State v. Corey*, 304 Kan. 721, 730, 374 P.3d 654 (2016). Owens argues that "[f]undamental fairness would have allowed the defense, pretrial, to seek its own firearms 'familiar' witness demonstration, taking into account Mr. Owens' unique physique." As the State points out, Owens was "never deprived of such an opportunity." His defense, dating back to the initial interrogation, was always that he fired the gun by accident. He could have hired an expert at any point to bolster this theory by showing that his accidental-shooting-from-inside-the-sling theory was feasible. See *State v. White*, 284 Kan. 333, 343, 161

28

P.3d 208 (2007) (district court did not err in denying mistrial motion where prosecutor's failure to disclose change in expert testimony did not destroy, or even change, the theory of defense), *superseded by statute on other grounds as recognized in State v. McLinn*, 307 Kan. 307, 320, 409 P.3d 1 (2018).

Owens also argues that a mistrial was required because "the defense was unprepared to rebut the new evidence and the bells could not be unrung." We disagree. The defense was given the opportunity to meet with Detective Chisholm before he testified to examine him about his demonstration. The defense thoroughly cross-examined Detective Chisholm about the demonstration on the stand. Insomuch as the defense was caught off-guard by the State's opening, we cannot say this resulted in incurable prejudice. Further, as to the prosecutor's opening remarks, the jury was appropriately instructed that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." See *State v. Kleypas*, 305 Kan. 224, Syl. ¶ 16, 382 P.3d 373 (2016) (Generally, we presume juries follow a court's instructions, and a defendant must come forward with some evidence to overcome the presumption to demonstrate grounds for mistrial.).

The State's failure to disclose Detective Chisholm's reconstruction did not result in incurable prejudice, resulting in an injustice. We hold that the district judge did not abuse his discretion by denying Owens' request for mistrial.

*The Second Mistrial Motion*

Owens lodged his second motion for a mistrial after the State played an unredacted version of a recorded phone call between police and Owens' mother. Before playing the recording, the State represented to the defense and to the court that it had

29

redacted the portion of the tape where Owens' mother said she wanted to consult an attorney in response to a detective's request to search her home. Yet, the recording that the State played was not redacted. Owens moved for a mistrial because "[w]e were told, specifically, that that information would not be played in front of the jury, and it was."

The district judge denied the request, reasoning:

"The evidence that was presented—the issue is Ms. Owens saying that she wasn't sure she wanted the police to search their house and asking if she needed a lawyer, which the question really is whether it is admissible or not as it relates to Mr. Owens, who is on trial. It is evidence that the parties had agreed would not come in. It did come in, and if it is admissible evidence, it is not overly prejudicial to this defendant, because it does not affect any rights that he, himself, exerted. He, at that time, was 27 some-odd-years old."

The district judge also offered a limiting instruction directing jurors to disregard Owens' mother's comment about an attorney. Owens declined the instruction, motivated by a desire to "not ring the bell again."

We again return to the two-step framework from *Waller*, 299 Kan. at 725-26. First, we consider whether the district judge abused his discretion by finding no fundamental failure in the proceeding had occurred. Owens argues the district judge "did not address the unfairness to the defense. Instead, [Owens claims] the court minimized the damage, stating it was 'not shocking' that [Owens' mother] was reluctant to agree to a search of her home." Moreover, Owens suggests "[a]ny implication that Mr. Owens' family had something to hide, or were protecting him, was damaging to his defense, which was based on credibility."

We hold that the district judge did not abuse his discretion by finding that the presentation of the unredacted tape was not a fundamental failure in the proceedings. A jury could reasonably understand why Owens' mother may have wanted to consult with

30

an attorney before agreeing to a search of her home. The jury's knowledge that Owens' mother wanted an attorney's advice did not amount to a fundamental failure. See, e.g., *State v. Rice*, 261 Kan. 567, 593, 932 P.2d 981 (1997) (The district judge did not abuse his discretion by denying a motion for mistrial after a police officer testified that the defendant invoked his right to counsel, where "jury was told to draw no negative implication from Rice's decision not to talk with police before talking with his attorney and no further mention of the incident was made."). And Owens fails to establish that any prejudicial inference would have been attributed to him, rather than his mother. Finally, the district judge offered a limiting instruction here, but Owens declined it.

Because we find no error in the district court's conclusion that there was no fundamental failure in the proceedings, we need not proceed to the second step and consider prejudice. Accordingly, we hold that the district judge did not commit reversible error by denying Owens' motions for mistrial.

*The Aggravated Burglary Instruction Was Not Clearly Erroneous*

Owens next argues that the district judge committed reversible instructional error. Specifically, he challenges the definition of "knowingly" that the district judge provided in the aggravated burglary instruction.

*Standard of Review*

"This court follows a four-step progression when reviewing challenges to jury instructions: First, it considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, it applies unlimited review to determine whether the instruction was legally appropriate; then, it determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, this court determines whether the error was harmless,

31

utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012)." *State v. Claerhout*, 310 Kan. 924, 935-36, 453 P.3d 855 (2019).

However, if a defendant fails to object to the instructional error below, the clear error standard is applied to assess prejudice. Instructional error is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Dominguez*, 299 Kan. 567, 574, 328 P.3d 1094 (2014).

*Analysis*

The State argues that Owens is not entitled to relief on this front because he not only assented to the district judge's proposed instruction containing the challenged definition of "knowingly," but in fact invited the error by requesting the same definition in his proposed instructions. The invited error argument is baseless because Owens proposed this definition of "knowingly" in the context of an instruction titled "homicide definitions," not as part of the instruction on the elements for aggravated burglary and aggravated assault. Owens therefore did not invite the error he now complains of, that is, the district court's definition of "knowingly" in the aggravated burglary instruction.

Nevertheless, Owens did not object to the district court's instruction at trial. Thus, the clear error framework applies. *State v. Boeschling*, 311 Kan. 124, 131, 458 P.3d 234 (2020) ("[T]he clear error framework applies when a party fails to object to an instruction below but claims that instruction is error on appeal.").

The State charged Owens with aggravated burglary. Under K.S.A. 2020 Supp. 21-5807(b)(1) and (c)(2)(A), the elements of aggravated burglary are:

32

1. Without authority

2. Entering a dwelling

3. While another person was inside said dwelling

4. With the intent to commit a felony therein.

The felony that the State alleged Owens intended to commit inside the home (under the fourth element of aggravated burglary) was aggravated assault. K.S.A. 2020 Supp. 21-5412 defines aggravated assault as "knowingly placing another person in reasonable apprehension of immediate bodily harm" using a deadly weapon. Thus, the culpable mental state for aggravated assault is "knowingly."

Owens argues that the district judge erred by instructing the jury, with respect to the aggravated assault underlying the aggravated burglary, that "[a] defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about." This is PIK Crim 4th 52.010 option 1 for the definition of "knowingly." Owens contends the district judge should have instructed the jury that a defendant acts knowingly "'when he or she was aware that his or her conduct was reasonably certain to cause the result.'" This is PIK Crim 4th 52.010 option 3 for the definition of "knowingly."

We disagree because the district court's instruction was legally appropriate. In this case, any distinction between the two definitions of "knowingly" is one without legal significance. The definition of "knowingly" in the instruction as given meant that the jury had to find that Owens was aware of the nature of the conduct of which the State complains. In other words, Owens had to be aware that his conduct was reasonably certain to put Rowena in fear. Defendant's proposed definition of "knowingly" conveyed the same meaning. The district court's denial of the requested instruction was not clearly erroneous because the instruction as given properly and fairly stated the law as applied to the facts of the case. See *State v. Pabst*, 273 Kan. 658, 659, 44 P.3d 1230 (2002) (where

district court denies requested instruction, appellate court focuses inquiry on whether instruction given properly and fairly stated the law as applied to the facts of the case).

Furthermore, the record was rife with evidence of Owens' "knowledge," i.e., that Owens was aware that his conduct would place Rowena in reasonable apprehension of immediate bodily harm. Based on Owens' own account of the incident during interrogation, he decided to park down the street, rather than in Rowena's driveway, to avoid detection. Owens entered Rowena's house with a gun to be "take[n] . . . seriously." He carried the gun in the sling, without concealing it entirely, because he wanted Rowena to know he had a gun. He said he was "pissed" at Rowena because she did not give him a "legitimate explanation" for the breakup. Based on this evidence, we are not firmly convinced that the jury would have reached a different verdict under Owens' requested instruction.

For these reasons, the district court's aggravated burglary instruction was legally proper, factually appropriate, and not clearly erroneous.

*The Prosecutor Committed Harmless Error in Closing*

Owens next argues that the State committed reversible prosecutorial error. First, Owens complains that the prosecutor inappropriately used the "dug a hole" evidence to "show propensity and character through conduct" in closing. Further, Owens complains that the prosecutor argued facts not in evidence by referencing missed mental health appointments that were not actually supported by admitted evidence. We address each complaint in turn.

34

*Standard of Review*

"In considering a claim of prosecutorial error, [the court] follow[s] a two-step analysis. [It] first determine[s] whether an error occurred. Second, if an error has been found, [it] evaluate[s] the prejudice [the error] caused to determine whether it was harmless. At the first step, error occurs if the appellate court determines the prosecutor's actions or statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' A criminal defendant establishes the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences with no evidentiary foundation. [Citations omitted.]" *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019).

*The Prosecutor's Argument Regarding the "Dug a Hole" Evidence*

Owens first challenges the prosecutor's reference to the "dug a hole" evidence. The challenged portion of the State's closing provided:

"What do we have? We have a guy who his roommates and his mom knows he has a .45. That gun will not be found because it's not at his house. The cops don't know that it's in the lake. They'll never find it, okay. It's not in Manhattan; it's not at his folks' house. He has been told over and over again to stay away from her by her own brother who is a cop. She has cut him off of her social media. He's in the Wichita area the day of the shooting. He is alone. His family is not with him. No one is going to give him an alibi. And we've got Marvin sitting in his driveway, and we'll have pictures that the cops are going to find, because they did, of him going in and going out, and a car consistent with his dad's truck. If I got no statement from him, is that the kind of circumstantial case you would want to look at and give some weight to? He's the ex-boyfriend. He's breaking up. His last words to her the last time they spoke was this whole business about, well, the last girlfriend I had—and tells that whole story. It's irrelevant if that's true. It's just a weird thing to say to a girl you're trying to get back in touch with. 'Well, the last girlfriend I had, I dug a hole for.'

35

"When tragedies happen people want to try to make sense of them."

The prosecutor went on:

"It is not a unique story. He dated a girl. He wanted it to go in a direction she didn't. He's talking marriage after six weeks, eight weeks. When she told him right off the bat, 'Brother, this is going to be fun, but I'm heading out of state.' And then told it was over. He doesn't leave it alone. He tells her this crazy story; tells her what happened in war.

"Her own family, her brother gets involved and says, 'Back off.' She defriends him. He brings his gun from Manhattan. He takes it home and gets it loaded. He gets in his dad's car and he drives to the house. Whether he was driving around or sitting and waiting, okay. A whole lot of time passes while he's thinking about what he's going to do. He could have turned around and headed back to Andover, or Manhattan for that matter. But he chose to stay. He chose to park. He chose to walk up there. And he chose to have that weapon out."

Owens claims the State used the "dug a hole" comments impermissibly "to show propensity and character through conduct," and to "inflame the passions or prejudices of jurors." But he does not develop these arguments beyond these bare assertions.

To the contrary, the prosecutor's argument illustrated how Rooshad's testimony (that Owens told Rowena about the "dug a hole" story) controverted Owens' claim that he went to Rowena's home just to talk about getting back together. Based on this testimony, the prosecutor reasonably argued that after Owens told Rowena the "dug a hole" story, it was unlikely that Owens was bewildered by Rowena's decision to end the relationship and that he entered her home only in search of Rowena's "legitimate" explanation for the breakup. We hold that these comments were founded on reasonable inferences from the admitted evidence and within the "wide latitude" afforded to prosecutors in closing argument. See *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015).

36

*The Prosecutor's Argument Regarding the Missed Medical Appointments*

Next, Owens argues that the prosecutor argued facts not in evidence in closing argument by claiming Owens missed several scheduled mental health appointments and referencing, as support, medical records that were not admitted into evidence. During this section of closing, the State attacked Owens' argument that his PTSD, traumatic brain injury, and mental health issues caused him to accidentally fire the gun. The prosecutor said:

"You're going to get all these stacks of records about all the efforts he went through, and the VA was letting him down. And, you know, he's got PTSD and all these things, and he's just not getting the help he wants. For what it's worth, if you want to pore through them, page 120 of the Levine [*sic*] records, this is in May of '16, so what, just three or four months before the act. 'The patient did not show up for his appointment. This is his fourth consecutive no show.' This is a guy who is crying for help; he sure misses a lot of appointments with his docs. Again, this is a pattern. It goes back to May of '15. 157, I think it is, yeah. 'Patient did not show up for his appointment.'

"'Patient did not show up for his appointment,' page 158.

"He no-showed for his new patient appointment, page 177. Does that mean anything? Does that mean he's guilty of murder? No. But as we're trying to—as the defense wants to put all of this into this notion that he's been to war. He's served his country honorably. He came back a different man, and he's not getting the support and help he wants, and that's why he was at this dire, dark place and this accident, this terrible accident happened, well, take a good, hard look at that."

The State concedes that "the medical records in the record on appeal do not contain the page numbers referenced by the prosecutor." But the State attempts to smooth over the fact that the prosecutor's statements did not match up with the records in

evidence by arguing that the "fact" that Owens did not utilize medical help available to him "was indeed in evidence."

The State's argument is unconvincing. The prosecutor plainly argued facts not in evidence. The prosecutor said Owens' pattern of declining help "goes back to May of '15." None of the record cites the State referenced to support the prosecutor's closing argument date back to May of 2015. The only admitted records from Lafene Health Center in 2015 confirm that Owens did attend scheduled appointments, and none offer support for the prosecutor's argument. And the admitted Veterans Administration records do not reflect any treatment provided or offered to Owens in 2015 at all.

Similarly, none of the record cites submitted by the State in its appellate brief deal with a no-showed "new patient" appointment, which the prosecutor also claimed Owens missed. "[I]t is clearly improper for a prosecutor to state facts that are not in evidence." *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017) (citing *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 [2004]). Doing so exceeds the "wide latitude" afforded to prosecutors in closing. *Ballou*, 310 Kan. at 596. Thus, the prosecutor committed error during closing argument, and we must proceed to the second step of the analysis "to determine whether it was harmless." 310 Kan. at 596.

"Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error . . . did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict." *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017) (citing *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016]). The State contends the prosecutor's error does not warrant reversal of Owens' convictions because any error is harmless. Ultimately, we agree with the State.

The State charged Owens with first-degree premeditated murder or, in the alternative, felony murder. Owens used the medical records to bolster his defense that

38

Owens did not intend to pull the trigger and shoot Rowena, therefore, suggesting the killing was accidental, not intentional and premeditated. The State's closing argument relied on medical records not in evidence to challenge this defense.

Ultimately, the jury acquitted Owens of first-degree, premeditated murder and convicted him under the alternate theory of felony murder, specifically a killing in the commission of aggravated burglary. Owens' defense—that he did not pull the trigger intentionally or with premeditation—was not a legally viable defense to Owens' crime of conviction. Whether Owens intentionally pulled the trigger or did so accidentally makes no legal difference for purposes of felony murder. The jury did not have to find Owens intended to kill Rowena or acted with premeditation to convict him of felony murder; the jury only had to find Owens killed Rowena while committing aggravated burglary. See *State v. Mireles*, 297 Kan. 339, 366, 301 P.3d 677 (2013) ("[T]he elements of felony murder do not include a killing that is intentional or done with premeditation."). And, as discussed previously, there is abundant evidence to support the jury's finding that Owens killed Rowena during an aggravated burglary. Therefore, the prosecutorial error was harmless beyond reasonable doubt.

*No Cumulative Error*

Owens contends he is entitled to a new trial because of cumulative error. This court may reverse a defendant's convictions for cumulative error "when the totality of the circumstances demonstrate that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial." *State v. George*, 311 Kan. 693, 709, 466 P.3d 469 (2020) (citing *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 [2014]).

*Standard of Review*

"The test is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial under the totality of the circumstances. See *State v. Tully*, 293 Kan. 176, 205-07, 262 P.3d 314 (2011). In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *State v. Ward*, 292 Kan. 541, 578, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). 'No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.' *State v. Colston*, 290 Kan. 952, Syl. ¶ 15, 235 P.3d 1234 (2010); see, *e.g.*, *Alvarez v. Boyd*, 225 F.3d 820, 824-25 (7th Cir. 2000) (listing various factors to be considered in cumulative error analysis), *cert. denied* 531 U.S. 1192 (2001); *United States v. Fernandez*, 145 F.3d 59, 66 (1st Cir.1998) (same). Because the standard under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), applies to the three instances of prosecutorial misconduct, '"the cumulative error must be harmless beyond a reasonable doubt.'" *Tully*, 293 Kan. at 205 (quoting *United States v. Toles*, 297 F.3d 959, 972 [10th Cir. 2002])." *State v. Holt*, 300 Kan. 985, 1007-08, 336 P.3d 312 (2014).

Here, we presumed (without deciding) error in the first step of the mistrial analysis based on the State's failure to disclose Detective Chisholm's demonstration before trial. But we concluded that the district court did not err by concluding the trial could proceed without injustice. We also held that the State committed prosecutorial error by stating facts not in evidence during its closing argument. But we concluded this error was harmless beyond reasonable doubt.

The presumed error and harmless prosecutorial error affected separate and distinct subject matter and issues. The errors were not interrelated in a way that enhanced their prejudicial force. In other words, the cumulative impact of the errors is no greater than the sum of their individual parts.

Moreover, the weight of the evidence against Owens was remarkably strong. The jury heard Owens' confession to shooting Rowena, after he entered her home without permission to intimidate her. The State supplemented the confession with substantial direct and circumstantial evidence that convincingly established the elements of felony murder and aggravated burglary. Given the negligible impact of the unrelated errors, coupled with the strength of the State's evidence, we hold that the cumulative effect of the errors was harmless beyond reasonable doubt and did not deny Owens a fair trial. See *Tully*, 293 Kan. at 205-07.

*Kansas' Criminal Restitution Scheme Implicates Section 5 of the Kansas Constitution Bill of Rights*

Finally, Owens argues that Kansas' criminal restitution scheme is unconstitutional. Under that scheme, district court judges must order criminal defendants to pay restitution. This restitution includes, but is not limited to, damage or loss caused by the defendant's crime, as determined by the judge. See K.S.A. 2016 Supp. 21-6604(b)(1); K.S.A. 2016 Supp. 21-6607(c)(2). Once the judge orders restitution, the statutory scheme converts the award into a civil judgment, which may be enforced the same as any other civil judgment. K.S.A. 2016 Supp. 21-6604(b)(2); K.S.A. 60-4301.

Owens argues this statutory scheme violates section 5 of the Kansas Constitution Bill of Rights, which provides: "The right of trial by jury shall be inviolate." He contends this guarantee preserved the common-law right to have juries determine damages in civil tort claims. According to Owens, the statutory restitution scheme effectively allows a judge, rather than a jury, to determine civil damages, thus implicating section 5. He therefore asks this court to vacate his restitution order.

*Preservation*

Owens admits he did not raise this constitutional challenge before the district court. Generally, we do not consider constitutional claims for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). That said, we agree with Owens that his claim meets one of the discretionary exceptions to this general rule—that consideration of the claim is necessary to serve the ends of justice or prevent the denial of fundamental rights. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010).

*Analysis*

Determining a statute's constitutionality is a question of law over which we have unlimited review. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

The outcome here is controlled by our decision in *Arnett*. There, we held that the current statutory restitution scheme violates section 5 by converting restitution orders, in which a judge determines the damages proximately caused by the criminal act, into civil judgments, thereby bypassing the traditional function of juries to determine civil damages. *Arnett*, 314 Kan. at ___, slip op. at 18. Specifically, *Arnett* held that K.S.A. 60-4301; K.S.A. 60-4302; K.S.A. 60-4303; K.S.A. 2020 Supp. 21-6604(b)(2); and the last sentence of K.S.A. 2020 Supp. 22-3424(d)(1) violate section 5. However, we also held that the proper remedy for this constitutional impropriety was to sever the offending portions of the statutory scheme rather than vacate every judicially determined restitution order. *Arnett*, 314 Kan. at ___, slip op. at 18.

Owens is thus correct that the criminal restitution statutory scheme implicates section 5. However, once the unconstitutional provisions of that scheme are severed, Owens' original restitution judgment is constitutionally firm. He will not be subject to a civil judgment for his criminal restitution unless it is obtained separately through a civil

42

cause of action. See *Arnett*, 314 Kan. at ___, slip op. at 18. Thus, we affirm the district court's restitution order.

For the reasons set forth herein, the judgment of the district court is affirmed.

DARYL D. AHLQUIST, District Judge, assigned.[1]

\* \* \*

ROSEN, J., concurring in part and dissenting in part: I agree with the majority's well-reasoned decision affirming Owens' convictions. Consistent with my position in *State v. Arnett*, 314 Kan. ___ (No. 112,572, this day decided), and *State v. Robison*, 314 Kan. ___ (No. 120,903, this day decided), I dissent from the majority's conclusion that the Kansas criminal restitution scheme does not violate the right to jury trial under section 5 of the Kansas Constitution Bill of Rights. I would adopt the reasoning set forth in Judge Leben's dissent in *State v. Robison*, 58 Kan. App. 2d 380, 395, 469 P.3d 83 (2020), and Justice Standridge's dissent that I joined in *Arnett,* slip op. at 19-36, to hold that our criminal restitution statutes are unconstitutional because they allow a judge—rather than a jury—to determine how much a criminal defendant must pay in restitution. I would vacate the restitution order entered in this case.

---

[1]**REPORTER'S NOTE:** District Judge Daryl D. Ahlquist was appointed to hear case No. 120,753, under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.